## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

**ROGER LEE HARRIS,**

     **Plaintiff,**

**vs.**                                                    **CIVIL ACTION NO. 2:16-CV-09528**

**NANCY A. BERRYHILL,[1]**
**ACTING COMMISSIONER OF**
**SOCIAL SECURITY,**

     **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's applications for Disability Insurance Benefits (DIB) under Title II and for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Order entered October 13, 2016 (Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the Plaintiff's Brief in Support of Claim and the Defendant's Motion to Remand. (Document Nos. 15 and 16.)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **GRANT** Plaintiff's request for judgment on the pleadings (Document No. 15.), **DENY** Defendant's request to remand the

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the Defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

matter back to the Commissioner (Document No. 16.), **REVERSE** the final decision of the Commissioner and **REMAND** for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g) for an award of benefits, and **DISMISS** this action from the docket of the Court.

## Procedural History

The instant matter is distinguishable from the typical appeal from the final decision of the Social Security Commissioner because this Court has previously adopted U.S. Magistrate Judge Cheryl A. Eifert's Proposed Findings and Recommendations (Tr. at 395-425.) and remanded this matter for further administrative proceedings on January 20, 2015.[2] (Tr. at 392-394.) Specifically, this claim was remanded by the District Court to determine if Plaintiff, Roger Lee Harris (hereinafter referred to as "Claimant"), met the diagnostic description of mental retardation[3], whether he had significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifesting during his developmental period, prior to age 22. (Tr. at 394.)

By Order dated April 13, 2015, the Appeals Council remanded the matter to the ALJ pursuant to the District Court's Order. (Tr. at 443-446.) Another administrative hearing was held before the Honorable Sabrina M. Tilley, Administrative Law Judge ("ALJ"), on January 29, 2016. (Tr. at 330-361.) On March 22, 2016, the ALJ again entered a decision finding Claimant was not disabled. (Tr. at 305-329.) On April 21, 2016, Claimant filed his exceptions to the unfavorable decision to the Appeals Council. (Tr. at 578-580.) The Appeals Council considered the reasons Claimant disagreed with the ALJ's decision and on September 16, 2016 declined to assume

---

[2] See, Harris v. Colvin, Case No. 2:13-CV 28109.
[3] The term "mental retardation" was replaced with "intellectual disability" effective September 3, 2013. 78 Fed. Reg. 46, 499-46,501 (Aug. 1, 2013). This change "does not affect the actual medical definition of the disorder or available programs or service," Id. at 46,500. The structure of the Listing, its diagnostic description, and its severity criteria also remain unchanged.

jurisdiction of the case, rendering the unfavorable decision the final decision of the Commissioner. (Tr. at 298-302.)

On October 12, 2016, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.) In response, the Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (Document Nos. 10 and 11.) Subsequently, Claimant filed a Brief in Support of Claim (Document No. 15.), in response, the Commissioner filed a Motion to Remand the case to the Commissioner. (Document No. 16.) The undersigned entered an Order directing Claimant to file a response if necessary, to the Commissioner's Motion (Document No. 17.), and Claimant filed his Memorandum in Opposition to the Commissioner's Motion (Document No. 18.), to which the Commissioner filed her Response. (Document No. 21.) Claimant then filed his Reply. (Document No. 22.) Consequently, this matter is fully briefed and ready for resolution.

**Claimant's Background**

Claimant would have been 37 years old on the alleged disability onset date and was 45 years old when the ALJ determined he was not disabled the second time; he is defined as a "younger person" by the Regulations on the date last insured ("DLI") and throughout the underlying proceedings. See 20 C.F.R. §§ 404.1563(c), 416.963(c). (Tr. at 321.) Claimant left school before completing the eighth grade and had attended special education classes; he did not obtain a GED. (Tr. at 37, 159-160, 345, 348.) Claimant resides with his mother, who suffers from Alzheimer's. (Tr. at 341.) Claimant does few chores around the house, such as running a vacuum, and he does all the cooking for himself and his mother. (Tr. at 340, 341.)

Since the previous administrative proceeding, Claimant fractured his pelvis and left

sacroiliac joint in January 2013. (Tr. at 743-748.)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(f), 416.920(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. §§ 404.1520(g), 416.920(g). The Commissioner must show two things: (1) that the

claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." Id. §§ 404.1520a(a), 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.
>
> (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None,

one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. §§ 404.1520a(d)(1), 416.920a(d)(1).[4] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination

---

[4] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. §§ 404.1520a(e)(4), 416.920a(e)(4).

**Summary of ALJ's Decision**

After the second administrative hearing, the ALJ determined that Claimant met the requirements for insured worker status through December 31, 2011. (Tr. at 310, Finding No. 1.) Moreover, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since June 30, 2008, the alleged onset date. (Id., Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from the following severe impairments: injuries to the back, neck, shoulders, and legs; headaches; learning disability; and anxiety. (Tr. at 311, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 312, Finding No. 4.) The ALJ then found that prior to January 23, 2013, Claimant had the residual functional capacity ("RFC") to perform a range of light work:

> He can lift and carry 20 pounds occasionally and 10 pounds frequently. He can sit 6 hours in an 8-hour day, and stand and walk 6 hours in an 8-hour day. He can occasionally reach overhead. He can occasionally climb ramps and stairs, but never climb ladders, ropes, and scaffolds. He can occasionally balance, stoop, kneel, crouch, and crawl. He can tolerate occasional exposure to loud noise, vibrations, hazards, and extreme temperatures. He retains the capacity to understand, remember, and carry out simple routine repetitive tasks. He can concentrate for 2-hour intervals of time and he should not have written instructions. All instructions should be verbal or oral. He can interact superficially with coworkers and supervisors but should have no interaction with the general public. He should have no work activity that is considered fast-paced production type work. He should make few if any work-related decisions. (Tr. at 314-315, Finding No. 5.)

Beginning January 23, 2013, the ALJ found Claimant had the RFC to perform sedentary

work, with the additional limitations described *supra*: "he can lift and carry 10 pounds occasionally and less than 10 pounds frequently. He can sit 6 hours in an 8-hour day, and stand and walk 2 hours in an 8-hour day." (Tr. at 318, Finding No. 6.)

At step four, the ALJ found that Claimant was incapable of performing his past relevant work. (Tr. at 320, Finding No. 7.) At the fifth and final step, the ALJ found that Claimant was 37 years old on the alleged onset date, making him a younger individual; that he had a limited education and able to communicate in English; that the transferability of job skills was immaterial to the determination of disability because his past relevant work is unskilled; and that based on his age, education, work experience, and RFC, there are other jobs that exist in significant numbers in the national economy that Claimant can perform. (Tr. at 321, Finding Nos. 8-11.) The ALJ determined that Claimant had not been under a disability from June 30, 2008 through the date of the decision. (Tr. at 322, Finding No. 12.)

**<u>Claimant's Challenges to the Commissioner's Decision</u>**

Claimant's appeal is two-fold: (1) that the ALJ erred by not finding Claimant's impairment met Listing 12.05B; and (2) that the ALJ's mental RFC assessment finding Claimant capable of understanding, remembering and carrying out simple, routine and repetitive tasks without constant supervision is not supported by substantial evidence. (Document No. 15 at 2-3.)

Claimant asserts that the ALJ ignored the evidence cited by Magistrate Judge Eifert when she determined the previous decision was not supported by substantial evidence, and further, the ALJ failed to heed Fourth Circuit case law as well as the Regulations that a claimant does not have to have a formal intelligent quotient test during the developmental period in order to meet Listing 12.05. (<u>Id</u>. at 12-14.) Claimant contends that the ALJ failed to mention Claimant's poor reading

8

performances on three different administrations of WRAT-4 tests, which was corroborated by Claimant's sister-in-law's testimony that she had to read things to him and complete paperwork for him. (Id. at 14.) Claimant also required someone to "shadow" him when he was employed in order to help him remember what to do, lest he "wander off". (Id. at 15, 17.) Claimant explains that the ALJ's decision is based on a selective review of the evidence that supported it, and failed to consider that evidence that contradicted her conclusions. (Id. at 15-17.) In short, Claimant argues the record of evidence supported that his intellectual deficits were present his entire life, not just after he turned 22. (Id. at 18.)

Finally, the ALJ's mental RFC assessments limiting Claimant to understanding, remembering and carrying out simple, routine, repetitive tasks without constant supervision ignored the opinion evidence provided by Dr. Eugene Maleski and Mr. Tanzey, the vocational expert, which was corroborated by Claimant's brother's testimony. (Id. at 18-19.) Claimant contends the ALJ gave no explanation as to why she gave no credit to Dr. Maleski's opinion that Claimant would require constant supervision, only that it conflicted with her RFC; this runs afoul of the holdings in Mascio v. Colvin, 780 F.3d 632, 638 (4th Cir. 2015) and Monroe v. Colvin, 826 F.3d 176, 190-191 (4th Cir. 2016). (Id. at 18-20.)

In sum, Claimant asks this Court to finally close this case and remand only for the payment of benefits. (Id. at 20.)

In response, the Commissioner moves for remand pursuant to the fourth sentence of 42 U.S.C. § 405(g) because further evaluation of Claimant's claim is warranted, specifically in terms of whether he meets or equals the criteria of Listing 12.05. (Document No. 16 at 1-2.) The Commissioner asserts remand for re-evaluation of Claimant's adaptive functioning is proper due

to the new Listing standards, plus additional medical expert evidence will be procured, and a different ALJ will be assigned to the matter. (Id. at 2.) Remand for the entry of benefits is only appropriate when the record has been fully developed and substantial evidence indicates a claimant is disabled, which is not the case here. (Id.)

Claimant opposes the Commissioner's motion for remand: that the record already supports a reversal for payment of benefits only, that this matter has been pending for over six years; that there is substantial evidence supporting Claimant had adaptive functioning deficits before age 22; and that another medical expert and another ALJ is unlikely to generate any new evidence on this narrow issue. (Document No. 18 at 1-3.)

The Commissioner responds that this case is far from remand for entry of benefits only because the record is replete with conflicting evidence, including conflicting opinion evidence, where there was no substantial evidence to support whether Claimant met or equaled Listing 12.05; further, this Court is prohibited from fact-finding and re-weighing the evidence or substituting its judgment for the ALJ's. (Document No. 21 at 1-2.) Claimant's arguments only support that remand for further fact-finding and eliciting further evidence about his pre-age-22 adaptive functioning is the appropriate remedy here. (Id. at 3.)

In reply, Claimant states Dr. Laura Bickett already found Claimant's full scale IQ score of 56 was valid, therefore the only issue remaining was whether his adaptive deficits manifested before age 22. (Document No. 22 at 1.) Despite the Commissioner's argument that there were no formal diagnoses that Claimant had an intellectual disability, Listing 12.05B does not require that. See Hancock v. Astrue, 667 F.3d 470 (4th Cir. 2012); See also Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006). (Id. at 1-2.) Moreover, there is already substantial evidence in the record that

Claimant had adaptive functioning deficits before age 22. (Id. at 2.) Finally, Claimant asserts that the case at bar is akin to Breeden v. Weinberger, 493 F.2d 1002 (4ᵗʰ Cir. 1974) as well as this Court's decision in Crisco v. Astrue, Civil Action No. 1:14-cv-28841 (S.D.W. Va. 2016), where reversal and payment of benefits were the appropriate remedies because again, the only issue to decide is whether Claimant had adaptive functioning deficits before age 22, additional testimony on this issue is not necessary or even likely available. (Id. at 2-3.) There is already evidence from two witnesses concerning Claimant's pre-age-22 functional deficits, therefore, the proper remedy here is reversal and remand for payment of benefits only. (Id. at 3.)

## The Relevant Evidence of Record[5]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

Educational Records:

Only one page of Claimant's educational records[6] were obtained from Walton High School in Roane County, West Virginia, indicating that he withdrew from school on October 7, 1986 when that he was in the eighth grade and nearly sixteen years old. (Tr. at 211.) He received a B in reading and a C in earth science in the first semester of eighth grade, though remaining grades in his other subjects were D's and F's; in the second semester, he received all F's and an incomplete in reading, and it was noted he had 101 absences. (Id.)

State Agency Psychological Examiner:

---

[5] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.
[6] The Court Transcript indicates that "No Records" were available from Roane County Schools Special Education Records. (Tr. at 214.) Claimant's attorney explained during the administrative hearings that the school system destroys the records five years after graduation. (Tr. at 335, 658.)

On January 31, 2011, the West Virginia Disability Determination Section referred Claimant to Kara Gettman-Hughes, M.A. for a psychological evaluation. (Tr. at 223-228.) As part of the evaluation, Ms. Gettman-Hughes administered a Wechsler Adult Intelligence Scale – Fourth Edition and found Claimant had a verbal comprehension score of 54, a perceptual reasoning score of 52, working memory of 58, processing speed of 56 and a full scale IQ of 48; these scores were described as "extremely low". (Tr. at 225.) Claimant was found to read at a K.7 level, perform math at a 1.2 grade level and spell at a 1.4 grade level. (Tr. at 226.)

Ms. Gettman-Hughes indicated that both the IQ scores and the WRAT-4 scores were invalid and not representative of his current level of functioning. (Tr. at 226.) She felt that he did not put forward good effort into the testing procedure, "He frequently responded 'I don't know' to test questions and did not use the allotted amount of time for task completion." (Id.) Ms. Gettman-Hughes diagnosed generalized anxiety disorder and pain disorder associated with both psychological factors and a general medical condition. (Tr. at 227.) With regard to Claimant's intellectual functioning, Ms. Gettman-Hughes acknowledged "a diagnosis of borderline intellectual functioning or even a mild mental retardation may be appropriate based on the claimant's academic history, work history, and interpersonal skills, including broad range of knowledge and vocabulary" even though the current test results were deemed invalid. (Id.) Ms. Gettman-Hughes indicated that Claimant's concentration was poor based on his ability to repeat digits and his pace was slow. (Tr. at 226.) She deemed his remote memory was poor based on his recall of personal history. (Id.)

On December 27, 2013, Ms. Gettman-Hughes again examined Claimant. (Tr. at 706-712.) On the third administration of a WAIS-IV, Claimant had a Verbal Comprehension score of 56, a

Perceptual Reasoning score of 58, a Working Memory score of 60, a Processing Speed score of 65 and a Full Scale IQ score of 63. (Tr. at 708-709.) As noted earlier, his score on the WRAT-4 showed reading at a kindergarten level. (Tr. at 710.) Ms. Gettman-Hughes again found these scores to be invalid. (Tr. at 709-710.) Ms. Gettman-Hughes diagnosed Claimant with generalized anxiety disorder and pain disorder associated with both psychological factors and a general medical condition. (Tr. at 710.)

Independent Psychological Examiner:

On June 5 and June 19, 2012, Claimant was evaluated by Laura Bickett, Ph.D., a licensed psychologist at Psych Services of Roane County, Inc. at the request of his attorney. (Tr. at 287-293, 659-665.) In preparation for her evaluation, Dr. Bickett was provided the psychological evaluation performed by Ms. Gettman-Hughes as well as the medical evaluation provided by Dr. Rakesh Wahi. (Tr. at 288, 660.) On a WAIS-IV, Dr. Bickett found that Claimant had a verbal comprehension index of 58, a perceptual reasoning index of 63, a working memory of 66, processing speed of 62 and a full scale IQ of 56. (Tr. at 291-292, 663-664.) On the WRAT-4, Claimant was found to read at a 1.1 grade level, spell at a K.6 level and perform math computation at a 1.7 level. (Tr. at 292, 663.) Dr. Bickett diagnosed Claimant with anxiety disorder not otherwise specified and "Mild Mental Impairment" and a global assessment of functioning of 45.[7] (Tr. at 293, 665.)

Dr. Bickett found that the scores on the WAIS-IV and WRAT-4 were valid. (Tr. at 292, 664.) She indicated that Claimant was alert and attentive and seemed to put forth his best effort:

---

[7] The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100. A GAF of 41-50 indicates that the person has "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994).

"On verbal items, he sometimes responded with 'I'm not for sure' and when prompted, made attempts to provide a response but these efforts were rarely correct suggesting to this clinician that when Mr. Harris responded with 'I'm not for sure' or 'I don't know,' he was being truthful versus exhibiting lack of effort or undue shyness." (Tr. at 291-292, 663-664.)

Dr. Bickett also interviewed Phillip Harris, Claimant's brother. (Tr. at 290, 662.) Mr. Harris explained that he worked with Claimant when he worked for Mike Kelly. (Id.) Mr. Harris reported that Mr. Kelly had to have someone with Claimant to shadow him and help him remember what to do and how to do it, otherwise he would wander off. (Id.) Mr. Harris also indicated that Claimant exhibited learning problems throughout childhood with great difficulty learning to read and write. (Id.) Mr. Harris reported that Claimant had significant employment difficulties over the years and estimated that Claimant had been laid off from various jobs 15 to 20 times because, "He couldn't follow what to do and he couldn't read and he couldn't get a driver's license." (Id.) Mr. Harris reported that Claimant made unsuccessful attempts to work in the oil fields and strip mines. (Id.)

Eugene F. Maleski, Ph.D. Interrogatory Responses:

On June 15, 2015, Dr. Maleski responded to medical interrogatories as requested by the ALJ. (Tr. at 730-734.) In response to the inquiry as to whether Claimant's mental impairments met or equaled Listings 12.05 on or before July 2, 1992, Dr. Maleski noted "there is no evidence of appropriate exams, or anything else, in the record pre 8/30/2007." (Tr. at 730.) However, Dr. Maleski opined that the WAIS-IV results and Mr. Harris's description of Claimant's functioning over his lifespan [Exhibit 10F] (Tr. at 287-297.), that "it remains conceivable that he could have met 12.05B prior to his 22nd birthday." (Tr. at 730.) He further opined that "I do believe that he has a valid FSIQ = 56 in [Exhibit 10F] and comparable FSIQ scores in [Exhibit 3F and Exhibit

16F] (Tr. at 223-230, 706-713.) which the examiner . . . deemed 'invalid'"[;] on the other hand, these scores could have been influenced by the ATV accident in 2007." (Tr. at 730.) Dr. Maleski concluded that Claimant's impairments did not meet or equal the criteria for any impairment described in the Listing of Impairments, specifically in consideration of 12.05 and 12.06. (Tr. at 732.) Dr. Maleski concluded that Claimant "can do simple, unskilled physical work where constant supervision is provided and he does not need to exercise in planning or judgment and where he does not need to read, write, or drive." (Tr. at 734.)

Records Related to Physical Impairments:

On August 29, 2007, Claimant was involved in an ATV accident from which he sustained a fracture of the C2 left lateral mass extending into the transverse foramen as well as non-displaced fractures through the left C5, C6 and C7 transverse processes. (Tr. at 273.) He also broke his right first rib (Id.) and had his left ear reattached and reconstructed because it was nearly avulsed. (Tr. at 270.) A CT scan of the chest showed a fractured inferior margin of the right scapula. (Tr. at 278.)

On February 14, 2011, Dr. Rakesh Wahi examined Claimant at the request of the Social Security Administration. (Tr. at 246-250.) Dr. Wahi found that Claimant had a 90 degree flexion of the right shoulder, a 120 degree flexion of the left shoulder, abduction of the right shoulder to 90 degrees and abduction of the left shoulder to 110 degrees. (Tr. at 249.) Adduction was 10 degrees on the right and 30 degrees on the left; internal rotation was 40 degrees bilaterally and external rotation was 90 degrees bilaterally. (Id.) In addition, the shoulder on the left showed a callus on the left clavicle. (Id.) Dr. Wahi assessed Claimant with functional illiteracy, multiple joint injuries and frequent headaches. (Id.) He noted that Claimant suffered from a learning

disability and "can barely sign his name, has difficulty reading, and doing simple Math." (Id.)

On January 28, 2013, Claimant reported to the emergency room at Roane General Hospital that he had fallen the night before. (Tr. at 743-744.) X-rays determined that he had multiple pelvic fractures and multiple sacral fractures with pubic ring fractures and symphysis diastasis after a fall. (Tr. at 745-747.) He was transferred to Charleston Area Medical Center where he stated that he slipped and fell down three to four steps. (Tr. at 670.) While in the hospital, he underwent surgery for external fixation to the anterior pelvic injuries including a displaced symphysis and a left superior and inferior pubic ramus fracture and placement of two SI screws in the right sacrum. (Tr. at 677.) The external pelvic fixation was removed on March 11, 2013 under anesthesia. (Tr. at 694.)

On April 7, 2013, Claimant reported to the emergency room at CAMC "I got roughed up." He indicated he had been in an altercation with a friend and had been hit repeatedly on the face and head with a flashlight. (Tr. at 699.)

On March 31, 2014, Claimant was examined by Dr. Deidre Parsley at the request of the Social Security Administration. (Tr. at 716-722.) Dr. Parsley reported that Claimant's injuries in 2013 (as occurring in February rather than January) were the result of a second ATV accident. (Tr. at 717.) Dr. Parsley diagnosed Claimant with chronic cervicalgia with a history of fracture of the C2 vertebra and transverse process fractures at C5, C6 and C7, chronic lumbalgia, history of sacrum fracture, history of pelvic fracture, status post open reduction and internal fixation in February 2013, chronic pelvic pain, chronic left knee pain and chronic nicotine dependency. (Tr. at 717.) Claimant could only perform one-half squat due to left knee pain and was off balance when standing on the left leg. (Tr. at 721.) Claimant had decreased range of motion of the cervical

spine and slightly decreased range of motion of the lumbar spine in the right lateral flexion only, and had decreased range of motion in the bilateral hips. (Tr. at 722.)

**The Administrative Hearing**[8]

Claimant Testimony:

In January 2013, Claimant severely injured his right hip in an ATV accident. (Tr. at 339, 343.) He testified that he suffers from swelling and numbness as a result, and that his injury prevents him from walking very far or from standing for longer than a half hour to an hour. (Tr. at 339.) He takes pain medication for his hip injury as well, but it continues to hurt all the time. (Tr. at 339-340.) Since this injury, he does not get out as he had before. (Tr. at 343.)

As far as chores go, Claimant admits he does not do much around the house, except maybe run the sweeper, and probably only for 15 minutes. (Tr. at 340.) He does not do yard work, as the landlord takes care of that. (Id.) Claimant still lives with his mother, who has Alzheimer's; she can take care of her own personal needs, however he does all of the cooking. (Tr. at 341.) Claimant states that he has to remind his mother of things because she is forgetful. (Id.)

Claimant usually has someone go with him grocery shopping. (Tr. at 342.) His sister-in-law helps him with the paperwork for his food stamps or for Social Security. (Tr. at 343.) He spends his day watching TV. (Id.) He does not drive; despite having attempted to take a driver's test several times, he never did pass. (Tr. at 344.)

---

[8] The undersigned notes that for purposes of eliciting testimonial evidence related to Listing 12.05, Claimant's attorney requested a subpoena for the medical expert in order to be cross-examined with respect to his opinion concerning Claimant's pre-age 22 adaptive deficits (Tr. at 334, 655.), however, for reasons that are not clear in the record, Dr. Eugene Maleski did not appear at the second administrative hearing.

Claimant related that he was in special education classes beginning in the fourth or third grade (Tr. at 345.) for reading, writing and math. (Tr. at 346.) He had difficulty remembering, but thought he completed the eighth grade. (Tr. at 348.)

Debbie Harris Testimony:

Mrs. Harris is Claimant's sister-in-law and has known Claimant for over 25 years. (Tr. at 350.) She reads any kind of paperwork for Claimant and explains to him what is necessary in order to fill it out for him. (Id.) She has taken him to go grocery shopping showed him how to buy things, but Claimant still needed help in figuring how much he could buy and how much he could spend with his food stamps. (Tr. at 350-351.)

Phillip Harris Testimony:

Mr. Harris is Claimant's older brother. (Tr. at 352.) Mr. Harris testified that Claimant has always lived with their parents except one time he lived with a girl for less than a year. (Tr. at 353.) Mr. Harris has helped get Claimant jobs where he worked, but "we'd have to go along behind him and make sure everything was right . . . he'd wander off and be doing something else." (Tr. at 354.) Mr. Harris testified that Claimant just could not concentrate on the task at hand, and "a lot of stuff he could do . . . but we had to check everything." (Id.) When Claimant worked, he was mostly a helper. (Tr. at 355.) As far as Mr. Harris knew, the only other job Claimant worked that he did not get for him was when Claimant worked for a neighbor who was a distant relation through marriage. (Tr. at 355-356.)

William Tanzey, Vocational Expert ("VE") Testimony:

The VE summarized Claimant's past work as a construction laborer as heavy and as a laborer in oil and gas fields as very heavy. (Tr. at 357.) Based on the ALJ's hypothetical question

that included the RFC limitations, *supra*, the VE testified that Claimant could not do any of the past work (Tr. at 357-358.), however, he could perform other light level jobs such as a general cleaner, vehicle cleaner, and garment folder. (Tr. at 359.) Of sedentary positions, the VE opined an individual of Claimant's background would be able to perform grader/sorter jobs, assembler jobs and hand packer jobs. (Id.) The VE stated that if the individual would need to be off task 15 to 20% of the time, then there would be no jobs that individual could perform. (Tr. at 360.)

When asked by Claimant's attorney if the individual who was limited to simple, unskilled physical work and had to have constant supervision and not required to exercise judgment or planning, the VE testified that the person would be suitable "only for sheltered work, not competitive employment." (Id.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are

rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." <u>Blalock</u>, 483 F.2d at 775.

**<u>Analysis</u>**

<u>Listing 12.05:</u>

Appendix 1 to Subpart P of Part 404 provides numerous body system listings, including the criteria provided under Listing 12.05 for intellectual disability. The Regulations state:

> The structure of the listing for intellectual disability (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for intellectual disability. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing.

Therefore, under Listing 12.05, Claimant must show "significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period (before age 22)."

> Deficits in adaptive functioning refer to how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background. Adaptive functioning involves adaptive reasoning in three domains: conceptual, social, and practical. The *conceptual (academic) domain* involves competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations, among others. The *social domain* involves awareness of others' thoughts, feelings, and experiences; empathy; interpersonal communication skills; friendship abilities; and social judgment, among others. The practical domain involves learning and self-management across life settings, including personal care, job responsibilities, money management, recreation, self-management of behavior, and school and work task organization, among others.

American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u>, ("DSM-5") 37 (5th ed. 2013) (italics in original). The severity level is met when the requirements

under A, B, C or D are satisfied. Id. At issue here, is whether Claimant met or equaled the criteria of Listing 12.05B: Claimant must show a valid verbal, performance, or full scale IQ of 59 or less. Claimant states that the ALJ misinterpreted the Regulations in requiring an IQ test during a claimant's developmental period in order to meet or equal Listing 12.05: "I'm not sure testimony from a layman would necessarily be helpful because we still don't have IQ score from prior . . . to age 22. So I'm not sure how we fill in that gap[.]" (Tr. at 336.)

The ALJ ultimately found that 12.05B had not been met "because the claimant does not have a valid verbal, performance, or full scale IQ of 59 or less with deficits in adaptive functioning that manifested during the developmentally [*sic*] period with onset before age 22." (Tr. at 314.) In support of this finding, the ALJ noted the record contained only one page of academic records prior to Claimant's 22nd birthday, and that it indicated Claimant was in the seventh grade, made B's and C's in English, Math, World Geography and Life Sciences, but F's in Art, Music, and Home Economics. (Id.) The ALJ also recognized that the record showed Claimant was absent 47 days during that school year. (Id.) The ALJ found it "[n]oteworthy" that before Claimant withdrew from school, after having missed 101 days of school, he "made a 'B' in reading." (Id.) The ALJ further noted that Claimant testified that he had attended special education, receiving assistance in reading, writing, and math, and that he also attended regular classes.[9] (Id.) Claimant was unable to obtain a driver's license, but "engaged in work activity earning above substantial gainful levels." (Id.)

---

[9] Claimant points out that there is no evidence supporting the ALJ's written assertion: "Following graduation . . . ." (Tr. at 314.) (Document No. 15 at 14.), and the undersigned agrees, however, the overall decision makes no further findings or assertions that would contradict her finding that Claimant has a limited education, therefore, this appears to be nothing more than a scriveners' error.

With respect to Claimant's social life, the ALJ acknowledged that he used to reside with a girlfriend and has three close friends, and that he "chats on the telephone daily." (Id.) Regarding his independence in his activities of daily living, the ALJ noted Claimant attends medical appointments, shops, pays bills, runs errands, and cares for his mother with Alzheimer's. (Id.)

The ALJ recognized Ms. Gettman-Hughes's determination that Claimant's IQ scores were invalid, as well as her opinion that Claimant would be able to manage his own benefits. (Id.) Acknowledging that Claimant had valid IQ scores in 2012, the ALJ, however, did not find deficits in his adaptive functioning prior to age 22. (Id.) The ALJ further noted Dr. Maleski's opinion that no information was available to establish the criteria for 12.05 had been met; once again, additional school records were requested in January 2016, but none received. (Id.) Later in the decision, the ALJ expressly gave Dr. Maleski's opinion "substantial weight" to the extent that he also found no evidence in the record to support 12.05 criteria prior to Claimant's 22nd birthday. (Tr. at 320.) In contrast, the ALJ gave Dr. Laura Bickett's opinion "little weight"[10] (Tr. at 318.), who opined Claimant's IQ scores were valid, which was corroborated by Dr. Eugene Maleski. (Tr. at 730.) Likewise, the ALJ gave Dr. Maleski's opinion to that extent "partial weight". (Tr. at 320.)

The ALJ's factual findings corroborate Claimant's argument that the ALJ focused more on the lack of written or official records to ascertain adaptive deficits, specifically, any valid IQ scores, prior to Claimant's 22nd birthday. The undersigned agrees with Claimant that this is contrary to Branham v. Heckler, 775 F.2d 1271 at 1274 (4th Cir. 1985) that recognized "there may

---

[10] The reasons provided for the "little weight" assessment was due to Dr. Bickett's status as a one-time examiner, whose opinion was inconsistent with the treatment history, work history and "the claimant's rather full activities of daily living." (Tr. at 318.) The ALJ further stated that this opinion was the product of Claimant's attorney's "effort to generate evidence for the current appeal", and though "legitimate", the ALJ noted "the context in which it was produced cannot be entirely ignored." (Id.)

be many reasons why an individual would not have the opportunity or need to have a formal intelligent quotient test until later in life. The fact that one was not earlier taken does not preclude a finding of earlier retardation." (Document No. 15 at 13.) Indeed, the undersigned further agrees with Claimant that the Regulations do not require contemporaneous documentation of IQ scores or evidence of functional deficits during a claimant's developmental period.

It is concerning that despite Claimant's attorney's request for a subpoena[11] in order to secure Dr. Maleski's testimony to clarify his opinion regarding Claimant's adaptive functioning prior to age 22, but for whatever reason, "it wasn't available to us" (Tr. at 334.), and the administrative hearing went forward, despite the ALJ's recognition that this case was previously remanded due to these precise evidentiary gaps this Court previously determined precluded a finding for substantial evidence. (Tr. at 336.) The fact that Dr. Maleski was ambivalent in his opinion that Claimant's intellectual impairments were from birth or from the ATV accident in August 2007 demanded that his opinion be explored further, especially in light of this Court's remand order. In short, the undersigned agrees with Claimant's assertion that the ALJ's second decision denying Claimant's application for benefits is based upon her selection of only that evidence that supported her ultimate conclusion. Hines v. Barnhart, 453 F.3d 559, 566 (4th Cir. 2006).

Additionally, the undersigned notes that U.S. Magistrate Judge Eifert previously highlighted the ALJ's flawed analysis regarding Claimant's deficits in adaptive functioning in her

---

[11] Claimant's attorney provided correspondence dated June 24, 2015 to prior counsel from the ALJ which was attached as an exhibit to his brief. This correspondence was not included in the Court Transcript and was not referenced in the Court Transcript Index, however, Claimant's then-counsel's July 6, 2015 correspondence responding the ALJ's invitation to request a subpoena for Dr. Maleski's appearance (by telephone) was part of the Court Transcript, therefore, presumably Claimant's request to subpoena Dr. Maleski was received. (Tr. at 655.)

Proposed Findings and Recommendations.[12] (Tr. at 412-422.) Even a cursory review of the instant decision denying Claimant's claim for benefits illustrates that the ALJ did not consider U.S. Magistrate Judge Eifert's concerns for the inadequate treatment of the relevant evidence of record.

Accordingly, with regard to the ALJ's decision finding Claimant did not meet Listing 12.05B criteria, the undersigned **FINDS** this determination is not based upon substantial evidence.

The Fifth and Final Step of the Sequential Evaluation Process:

As described *supra*, once a claimant establishes a *prima facie* case of disability, the burden then shifts to the Commissioner to demonstrate that he is capable of performing other forms of substantial gainful activity, given his remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R §§ 404.1520(g). 416.920(g); see also McLain v. Schweiker, 715 F.2d 866, 868-869 (4th Cir. 1983). To paraphrase briefly, the ALJ found Claimant capable of employment that did not require fast-paced production work with only superficial interaction with co-workers and supervisors, no interaction with the public, and which would be limited to simple, routine repetitive tasks, without written instructions, and few, if any work-related decisions. (Tr. at 318, Finding No. 6.) At the crux of Claimant's appeal on this narrow issue is that the ALJ rejected Dr. Maleski's opinion that Claimant would require "constant supervision" in a work setting, without any further explanation. (Tr. at 734.) (Document No. 15 at 18-19.)

There were numerous references in the decision where the ALJ noted evidence that seemed to contradict the evidence she relied upon to support her conclusion regarding Claimant's functional independence: (1) he attempted "three to four times to get his [driver's] license but

---

[12] It is noted that U.S. Magistrate Judge Eifert found the ALJ's previous analysis was deficient by not recognizing or considering that prior diagnoses of intellectual disability, illiteracy, no evidence of living independently, dependence upon others, no responsibility to care for others, poor academic performance, and unstable job performance have all been interpreted by courts that indicate earlier onset of deficits in adaptive functioning. (Tr. at 413-414.)

could not pass a written or oral test" (Tr. at 315.); (2) he shops "with help from his brother" (Id.), with help from a neighbor, and formerly with help from his sister-in-law (Tr. at 316.); (3) his brother helps him take care of money in the household (Tr. at 315.); (5) his neighbor cleans his house (Id.); (6) his mother "does the cooking" (Tr. at 315-316.); (7) his sister-in-law helped him complete his Social Security paperwork and completes forms on his behalf (Tr. at 316.); and (9) when Claimant goes shopping by himself, his sister-in-law testified that he "gets only a few items, as he cannot figure out how much he has [on] his car[d]."[13] (Id.) Claimant's dependence on others extended into his employment history as well: the ALJ noted that at Wizard Well Service[14], he was "usually told what to do as part of the job" (Tr. at 315.); when he worked in construction, he was "just a helper". (Id.) Claimant's brother, Mr. Harris, testified that he and another relative had helped Claimant get jobs, and would "go along behind the claimant to make sure everything was right." (Tr. at 316.) The ALJ acknowledged Mr. Harris's testimony that Claimant would wander off on the job due to his poor concentration, although he testified that Claimant "could do many things fairly well, but he was mostly a helper." (Id.)

Mr. Harris's testimony that Claimant required constant shadowing on the work site (Tr. at 354.) is consistent with Dr. Maleski's opinion that he needed constant supervision at work. (Tr. at 734.) Indeed, Mr. Harris reported this to Dr. Bickett as well (Tr. at 290.), leading Dr. Bickett to opine that "available information suggests that [Claimant] has had great difficulty sustaining

---

[13] The undersigned notes that the written decision contains another scriveners' error: "he cannot figure out how much he has in his cart" should reflect Mrs. Harris's testimony that Claimant is unable to determine how much money he can spend with his food stamps. (Tr. at 350-351.)

[14] It is interesting that in prior administrative hearing held on July 12, 2012, the VE testified that Claimant's job as a "sort of a utility worker with the rig . . . was designed for primarily by a friend or an acquaintance or relative" (Tr. at 499.), which he described as "unusual" giving the VE slight difficulty classifying Claimant's prior rig job under the DOT. (Tr. at 501.) Importantly, U.S. Magistrate Judge Eifert noted in her Proposed Findings and Recommendations that though the VE "did not use the word 'accommodation', the concept was certainly implied." (Tr. at 415.)

steady employment due at least in part to cognitive limitations and has relied on others throughout his life to assist him with activities of daily living, notably those requiring interactions in work[.]" (Tr. at 293.) Given the unrebutted evidence that Claimant required and would continue to require constant supervision or shadowing on the job, the VE's testimony that Claimant is precluded from competitive employment under those circumstances finds support in this evidence. (Tr. at 360.)

Nevertheless, the ALJ "surmise[d] that the record suggests that if the claimant is limited to simple routine repetitive tasks, he can sustain work a normal work schedule without the need of constant supervision." (Tr. at 320.) The undersigned notes that the record contains no evidence that rebuts Mr. Harris's testimony or Dr. Maleski's opinion that Claimant needed constant supervision in a work setting. Moreover, it is noted that the record contains no evidence that Claimant previously worked in any capacity beyond performing "simple routine repetitive tasks" which still required constant supervision or shadowing to ensure that he did the job correctly. Considering the ALJ's review of the aforementioned evidence, and the hypothetical questions posed to the VE, the ALJ's mental RFC did not "fairly" accommodate Claimant's mental impairments, specifically with respect to his history of working in a "sheltered work" type environment. Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989) (Tr. at 360.)

The undersigned is also mindful that 20 C.F.R. §§ 404.1527 and 416.927 govern the SSA's criteria for evaluating opinion evidence; per §§ 404.1527(a)(2), 416.927(a)(2):

> Evidence that you submit or that we obtain may contain medical opinions. Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

The Regulations provide that an ALJ must analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(c)(2)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Under §§ 404.1527(c)(1) and 416.927(c)(1), more weight is given to an examiner versus a non-examiner. Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1994).

It is important to reiterate that this Court already remanded this case due to this Court's finding evidentiary gaps that necessitated the solicitation of opinion evidence in order to determine whether Claimant met Listing 12.05B criteria, specifically whether his intellectual deficits were congenital or the result of head trauma. See, 20 C.F.R. §§ 404.1519p(b), 416.919p(b). The ALJ's rejection of Dr. Maleski's expert opinion evidence, that *was supported by other evidence* in the record, and replacing that opinion with her own lay opinion, which was *not* supported by other evidence, renders her conclusion erroneous that Claimant was capable of "simple routine repetitive tasks . . . without the need of constant supervision" and therefore lacks substantial evidence. (Tr. at 320.) Wilson v. Heckler, 743 F.2d 218, 221 (4th Cir. 1984.) In short, the undersigned finds that the ALJ did not faithfully honor the Regulations in evaluating the opinion evidence, resulting in a conclusion that is simply not "rational." Oppenheim, 495 F.2d at 397.

27

The Commissioner argues that remand for further administrative proceedings is necessary not only because of unreconciled conflicting evidence, and the potential to obtain additional evidence concerning Claimant's pre-age 22 adaptive functioning deficits pursuant to Listing 12.05B, but also because of the new Listing standards that recently came into effect as of January 17, 2017.[15] (Document No. 16 at 1.) However, the undersigned disagrees that this case turns on the evidence proving or disproving that Claimant met or equaled Listing 12.05B criteria. To put it succinctly, the Commissioner did not meet her burden in the fifth and final step of the sequential evaluation process. As mentioned *supra*, the record contains evidence from both lay witness testimony and expert opinion evidence that Claimant *was not and is not* capable of working simple, routine and repetitive jobs *without someone shadowing him*. Though the undersigned is mindful that the Court is prohibited from engaging in fact-finding exercises, and the threat of abuse of discretion to remand for entry of an award for benefits rather than for further administrative proceedings[16], the fact of the matter is that the Commissioner did not overcome Claimant's *prima facie* case of disability.

Further, there is no dispute that this case has been pending for over six years, and has been remanded once before to determine if the evidence supports a finding that Claimant met Listing 12.05B. The Fourth Circuit has determined that reversal without remanding "where the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose." Breeden v. Weinberger, 493 F.2d 1002, 1012 (4th Cir. 1974) (internal citations omitted). As in Breeden,

---

[15] Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed.Reg. 66138-01, 66138 n.1, 2016 WL 5341732 (Sept. 26, 2016).

[16] See, Radford v. Colvin, 734 F.3d 288, 296 (4th Cir. 2013).

both these circumstances are present in the case at bar.[17] There is no substantial evidence that would support a decision denying Claimant's applications and there would be no reason to remand for additional evidence. Assuming *arguendo* that Claimant did not meet Listing 12.05B criteria because his adaptive functioning deficits were not present during his developmental period, there is simply no contrary evidence of record that Claimant worked and could work outside a "sheltered" environment, and be in "competitive employment". (Tr. at 360.) All the essential factual issues have been resolved to that end, and the record adequately and clearly establishes Claimant's entitlement to benefits. Because Claimant's *prima facie* case for disability remained unrebutted at the final step in the sequential evaluation, the undersigned **FINDS** the ALJ's decision denying his claim is not supported by the substantial evidence.

**Recommendations for Disposition**

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **GRANT** the Claimant's motion in support of judgment on the pleadings (Document No. 15.), **DENY** the Defendant's Motion to Remand (Document No. 16.), **REVERSE** the final decision of the Commissioner, and **REMAND** this matter back to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for an award of benefits.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of

---

[17] Of interest here is that the Breeden matter also concerned a claimant's application for benefits that had been pending for "almost five years" and had also been remanded once for additional evidence. 493 F.2d at 1011.

objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Johnston, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: June 12, 2017.

Omar J. Aboulhosn
United States Magistrate Judge